PHG TECHNOLOGIES, LLC,          )
                                )
          Plaintiff,            )
                                )
v.                              ) No. 3:05-1091
                                ) JUDGE ECHOLS
TIMEMED LABELING SYSTEMS, INC., )
LASERBAND LLC, and              )
HOLDEN GRAPHIC SERVICES,        )
                                )
          Defendants.           )

<u>MEMORANDUM</u>

Pending before the Court are Plaintiff PHG Technologies, LLC's ("PHG's") Motion for Preliminary Injunction (Docket Entry No. 35) and Defendant TimeMed Labeling Systems, Inc.'s ("TimeMed's") Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 102(b) (Docket Entry No. 87), to which the parties have responded in opposition.[1]

PHG brings this action against TimeMed, LaserBand and Holden Graphic Services seeking to enforce design patents on medical label sheets, U.S. Patent Des. No. 496,405 S ("the '405 patent") (Plaintiff's Ex. 3), and U.S. Patent Des. No. 503,197 S ("the '197 patent") (Plaintiff's Ex. 5), and to protect its "EasyID" trademark. The design patents differ in that the margins which are part of the design shown in the '405 patent are not part of the

_____

[1]Defendant LaserBand LLC's ("LaserBand's") Motion to Join TimeMed's Motion for Summary Judgment of Patent Invalidity Under 35 U.S.C. § 102(b) (Docket Entry No. 118) will be GRANTED.

1

design shown in the '197 patent. PHG's Complaint includes claims against all Defendants for patent infringement under 35 U.S.C. §§ 284 & 285 (Counts I & II); false description and false designation of origin under 15 U.S.C. § 1125 (Count III); unfair or deceptive practices under the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-104 & 47-18-109 (Count IV); and trademark infringement and unfair competition under Tennessee common law (Counts V & VI). The Complaint also includes claims against Holden Graphic Services; however, Holden is not participating in the litigation because it agreed to stop selling its allegedly infringing product.

On July 25 and 26, 2006, the Court held a hearing on Plaintiff's Motion for Preliminary Injunction. Shortly before the hearing, Defendant TimeMed filed its Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 102(b), in which LaserBand joined. The Defendants contend that PHG's design patents are invalid in view of the sale of medical label sheets containing the label configuration shown in the '405 and '197 patents more than one year prior to the critical date, September 14, 2001.

## I. FACTS

The following facts are undisputed or, for purposes of the summary judgment motion, are taken in the light most favorable to PHG, the non-moving party. Unless otherwise stated, all exhibit numbers are those attached to the exhibits admitted into evidence

2

at the July 25 and 26, 2006 preliminary injunction hearing, even though the same exhibits may have been attached with different numbers to TimeMed's motion for summary judgment.

Thomas R. Stewart ("Stewart") and Brian D. Moyer ("Moyer") are principals of PHG. On September 14, 2001, Stewart and Moyer, as named inventors and through their counsel, filed a utility patent application for a "Medical Patient Labeling System and Method" which was assigned application no. 09/952,425 ("the '425 patent application"). (TimeMed Collective Ex. 5.) The utility patent application includes multiple embodiments, but does not specify a particular layout of medical labels on a sheet. The utility patent application is pending.

The '405 design patent, which was issued on September 21, 2004, and the '197 design patent, which was issued on March 22, 2005, claim priority from the '425 patent application. Moyer and Stewart assigned all right, title and interest in the two design patents to PHG. Patent application no. 10/899,283 ("the '283 patent application") claims to be a division of the '425 patent application. The '283 patent application claims subject matter disclosed in the '425 patent application.

On January 17, 2006, in connection with the prosecution of the '283 patent application, Stewart and Moyer each filed through counsel a Declaration Under 37 C.F.R. § 1.131, dated January 6, 2006, to establish dates they conceived and reduced to practice

3

their invention and subject matter claimed in the '283 patent application. On February 27, 2006, in connection with prosecution of the '425 patent application, Stewart and Moyer each filed through counsel a Declaration Under 37 C.F.R. § 1.131, dated February 14, 2006, to establish dates that they conceived and reduced to practice their invention and subject matter claimed in the '425 application. The Stewart and Moyer declarations filed in the '283 patent application are identical in substance. The Stewart and Moyer declarations filed in the '425 patent application are identical in substance to their declarations in the '283 patent application.

Prior to June 30, 2000, Moyer and Stewart conceived the design of a medical label sheet containing wristband labels of different sizes for application to medical identification wristbands. To incorporate their idea, Moyer and Stewart developed a label sheet which they referenced as the 20-101 label sheet. (Pl. Ex. 4.)

All 20-101 label sheets designed and sold by PHG embody, fall within the scope of, or are made in accordance with, each claimed design of the '405 and '197 patents. The 20-101 label sheet is shown in Figures 1 and 5 of the '425 patent application and the '283 patent application. The 20-101 label sheet is also shown in Figure 1 of the '405 patent and in Figures 1 and 2 of the '197 design patent.

4

In 2000, PHG was a small company with approximately five employees. PHG did not have the capability to manufacture laser label sheets. The design shown in the '405 and '197 patents and reduced to practice in the 20-101 label sheet originated from Moyer's attempts to arrange for the manufacture of a different medical label sheet.

On June 13, 2000, Moyer sent a letter to Dennis Shelton of Ward/Kraft, Inc., enclosing "a sample of the label stock we are interested in you manufacturing for us." (Pl. Ex. 14.) The label stock that Moyer enclosed was LaserBand's PLS-103, which PHG had been purchasing from LaserBand and re-selling to PHG's customers. (Pl. Ex. 2.) The PLS-103 was itself derived from Continental Data's 2610. (Pl. Ex. 1.) With regard to the PLS-103, Moyer explained to Shelton that "[w]e want to change the last row of labels to measure .75" x 3.75". You will notice that a pattern adhesive is currently being used around all edges and holes." A rough outline of the design Moyer requested is shown in Plaintiff's Exhibit 17. On June 20, 2000, Moyer sent a nearly identical letter to Nicole Martin of Avery Dennison. (Pl. Ex. 15.) In both of the letters sent to Ward/Kraft and Avery Dennison, Moyer stated: "I am interested in pricing and lead-time for samples and production runs." On June 21, 2000, Ward/Kraft responded with Quotation No. LR 22966. (Pl. Ex. 18.)

5

In the meantime, Moyer and Stewart changed their design to the one ultimately shown in the '405 and '197 design patents. On June 20, 2000, Moyer sent a second letter to Martin at Avery Dennison attaching "a new layout for the custom labels we are looking for. The top and bottom margins are both smaller than the previous sample I sent." (Pl. Ex. 19.) Avery Dennison responded with Quote Number B8N0683, on June 26, 2000. (Pl. Ex. 16.)

On June 30, 2000, Moyer sent a similar second letter to Shelton at Ward/Kraft, and asked Shelton to let Moyer "know if there is any change to your previous quote." (Pl. Ex. 20.) After Moyer sent the June 30th letter, he had telephone calls with representatives of Ward/Kraft. Moyer received an oral, not a written, quotation for the manufacture of 4,000 label sheets (four boxes of 1,000 sheets each), using the 20-101 design, at a specified price per box. According to PHG, many terms were not discussed.

Thus, by June 30, 2000, Moyer had disclosed to Ward/Kraft and Avery Dennison the 20-101 label sheet configuration with hole punches on the top and left margins, which is the design shown in the '405 patent. Moyer was acting for PHG when he made the disclosures. Since June 30, 2000, the 20-101 label design has not changed. According to PHG, Moyer made the disclosures to Ward/Kraft and Avery Dennison with the expectation of confidentiality for the purpose of fabricating samples of the label

6

sheet for testing by PHG. (Docket Entry No. 124, Ex. A, Moyer Depo. at 52 (under seal).)

On June 30, 2000, PHG ordered a die cut of the 20-101 design from Ward/Kraft. By ordering the die cut, PHG authorized Ward/Kraft to have the tool made which would produce label sheets in accordance with the design shown in the '405 and '197 patents. Again, according to PHG, the die cut was ordered for the purpose of fabricating samples of the label sheet for testing by PHG. Pricing for the test product run "was a whole different pricing structure" because of the small quantity desired. (Docket Entry No. 125, Ex. B, Moyer Depo. at 26.)

On July 10, 2000, Ward/Kraft sent PHG an invoice for the 4,000 label sheets (referencing Order Number LR-626303-01), which were scheduled for shipping on August 24, 2000. (Pl. Ex. 21.) The design of the label sheets is identical to the design claimed in the '405 patent. The price Ward/Kraft charged per box was much higher than what PHG would expect to pay for product marketed to customers, and the 4,000 quantity was lower than an expected production run of 100,000 sheets or more. PHG received the 4,000 label sheets in the week preceding August 24, 2000.

At its office, PHG tested the label sheets by running approximately 800 of them at high speed through four different laser printers ordinarily used by PHG's customers. PHG identified several problems with the label sheets. Moyer listed his concerns

7

in a memorandum to Roger Davis at Ward/Kraft on August 24, 2000. (Pl. Ex. 22.) These concerns included such things as hole punch residue, sheets that were not punched through, wrinkling around hole punches, adhesive at the edge of hole punches which endangered the proper operation of the laser printers, toner smudging, and paper jams. Moyer admitted that all of his concerns related to the function of the 20-101. PHG did not make any comments or complaints about the layout or design of the 20-101 label sheet; PHG did not test consumer acceptance of the design, but rather whether the product would run well in laser printers. No one outside PHG saw the sample labels. (Docket Entry No. 125, Ex. B, Moyer Depo. at 32.) The design of the label sheets did not change as a result of the testing. PHG paid Ward/Kraft a portion of the amount invoiced for the 4,000 label sheets, (Pl. Ex. 23), and destroyed the remainder of the label sheets.

On August 25, 2000, Ward/Kraft provided PHG with Quotation No. LR23229 for 1,000 to 2,000 boxes of a label sheet containing "30 cavities." (Pl. Ex. 24.) The quotation stated in part: "Price is based on producing, shipping & billing in one release . . . This is a reorder of LR626303 with a change of facestock. Price includes a change to slightly wider paper which should address concern #3 of your memo." The quotation also provided: "Any changes in specifications will alter these 'net' prices. All quotes are good for 60 days and subject to credit approval at time of order."

8

On August 28, 2000, Moyer sent a letter to Shelton at Ward/Kraft which began: "The purpose of this letter is to state the intention of phgtechnologies to purchase at least 1000 cases of labels at the price specified in your quotation No. LR23229. This purchase is contingent upon a successful manufacturing run resulting in labels that address the deficiencies outlined in my memo dated 8/28/00."[2] (Pl. Ex. 25.) The letter further stated:

> We are completely committed to this new label design, and have been for several months. We have a new software product designed specifically for this label, an existing customer base ready to start using them and new distributors and customers waiting for the labels to arrive.
>
> Please keep me posted with the status of the next test run. . . . I believe this can be a profitable venture for both companies, but it is imperative that we get a sellable product as soon as possible.

(Id.) In reliance on this letter, Ward/Kraft invested thousands of dollars to purchase new equipment needed to produce the 20-101 to PHG's specifications. (Docket Entry No. 125, Ex. B, Moyer Depo. at 38.)

On September 5, 2000, Ward/Kraft acknowledged a rush order from PHG for 4,000 of the 20-101 label sheets, with a scheduled ship date of September 20, 2000. (Order Number LR-627705-01). (Pl. Ex. 26.) This order acknowledgment was not based on any previous written quotation, but was drawn from oral discussion of the fabrication. According to PHG, this order was also placed to

_____

[2]Moyer testified this date should have read 8/24/00.

9

Case 3:05-cv-01091    Document 158    Filed 09/18/06    Page 9 of 46 PageID #: 2399

fabricate samples for PHG to test. Ward/Kraft's acknowledgment specifically stated: "THIS IS A 2nd TEST RUN WITH VACUUM DIE." The price per box was the same as that PHG paid previously.

In an e-mail dated September 13, 2000, Davis of Ward/Kraft told Moyer: "I got your message. We have ordered the special die for the hole-punching and it is supposed to ship on Friday[.]" (Pl. Ex. 36.) Davis promised to keep Moyer posted and to firm up a ship date for the 20-101 label sheets. Moyer wrote in a reply e-mail: "I have a meeting scheduled on the 26th in Nashville with several of our largest customers to talk about the new product. I selected the 26th because I thought we would have the next test run to show. Can you meet that deadline?" (Id.) Davis assured Moyer that Ward/Kraft would do its best to meet the deadline and "we should at the very least be able to ship 1 or 2 cartons on Monday, September 25th NDA." (Id.) At the preliminary injunction hearing, Moyer admitted that he did not have a meeting of his largest customers set up for September 26; rather, he had a meeting with a customer to explain the use and installation of software. Moyer hoped to have the second test run samples in hand and tested by that time. (Moyer Aff. ¶¶ 4-8.) Moyer stated he made the statement about the September 26 meeting in an attempt to induce Ward/Kraft to speed up the manufacturing process of the 20-101 labels. According to PHG, the second order for 4,000 labels also constituted fabrication of samples for a test run. PHG did not

10

intend to sell the samples to any customer, and PHG did not sell or show the samples to any customer. (Moyer Aff. ¶¶ 4-8; Pl. Ex. 27.)

PHG did not receive the second run of 4,000 labels under Order Number LR-627705-01 until October 10, 2000. Ward/Kraft sent PHG an invoice for the second run. (Pl. Ex. 37.) PHG paid Ward/Kraft the full price billed for the second run. (Pl. Ex. 33.)

PHG tested the second run of 20-101 label sheets and did not identify any problems with their manufacture. PHG placed a production order with Ward/Kraft for 100,000 label sheets on October 18, 2000. (Pl. Ex. 28; Docket Entry No. 125, Ex. B, Moyer Depo. at 54.) The same day, PHG ordered an additional 20,000 20-101 label sheets with a higher quality face stock, to be used for marketing purposes. (Pl. Exs. 29, 34.) Ward/Kraft did not issue a quotation for the production and marketing runs; instead, Ward/Kraft issued an Order Acknowledgment on or about October 18, 2000.

PHG first sold 20-101 label sheets to a customer, Russell County Medical Center, on November 8, 2000. (Pl. Ex. 31.) Also on November 8, 2000, PHG purchased quantities of the TabBand wristband, which is used in conjunction with the 20-101 labels. (Pl. Ex. 32.) With a minor price adjustment due to calculation error, PHG paid Ward/Kraft for the 100,000 and 20,000 label runs. (Pl. Exs. 33, 35, 38, 39, 40.) Despite e-mail communications in October 2000 about selling the 20-101 to Province Healthcare, (Pl.

11

Ex. 30), PHG did not sell any label sheets embodying the patented design to Province Healthcare until January 2001.

PHG asserts that it spent a significant amount of money to create and promote the 20-101 label sheet and associated products in the United States and thereby achieved substantial sales of the products. PHG claims that the 20-101 has achieved widespread and favorable public acceptance, recognition and goodwill and has become distinctive in the industry.

At the bottom of the 20-101, the following is printed: "U.S. Patent D496,405: D503,197; Other Patents Pending  EasyID[.]" (Pl. Ex. 4.) Stewart testified this information gives the public notice of PHG's patent rights. Moreover, PHG took steps to keep manufacturers like Ward/Kraft and Avery Dennison from copying the 20-101.

In June 2001, Gary Duffett, an Avery Dennison representative, assured PHG in a letter that "[i]n consideration of Avery Dennison becoming your Primary Laser Label Vendor, we agree to "Protect" your Patent Pending product design for this product [the 20-101] from being used by us for any other customer unless we have received specific written authorization to do so from you." (Pl. Ex. 8.) According to Stewart, Duffett failed to abide by the confidentiality agreement, and Avery Dennison produced similar product for LaserBand without asking PHG's permission to do so.

12

According to the testimony given at the preliminary injunction hearing by TimeMed Chief Operating Officer and Executive Vice President, Michael Casale, TimeMed began manufacturing and selling its accused product, TM-ADMIT-EID (Pl. Exs. 6 & 42) in 2003, unaware that PHG had any patents pending on the design embodied in the 20-101. TimeMed's accused product is very similar to PHG's 20-101 (Pl. Ex. 4), except that TimeMed's label sheet has four slightly rounded corners (while the 20-101 has square corners) and there is a die cut around the perimeter of TimeMed's 8 ½ x 11"-inch sheet that is not present on the 20-101. These two features of TimeMed's accused product are not shown in PHG's '405 and '197 design patents. Casale frankly admitted that TimeMed willfully copied the distinctive features of PHG's 20-101 label sheet design, and that TimeMed markets its competing product at hospitals which have installed PHG's patient identification software, fully intending that the hospital will use TimeMed's label product rather than PHG's. (Pl. Ex. 43.)

On August 29, 2003, PHG's counsel sent a letter to TimeMed notifying it of PHG's pending patent applications and requesting that TimeMed immediately cease and desist from manufacturing, using, selling, or offering to sell TimeMed's accused product. (Pl. Ex. 9.) TimeMed referred the letter to counsel, who sent a reply to PHG's counsel and requested certain information from PHG.

13

(Pl. Ex. 10.) When no information was forthcoming, TimeMed continued to sell its accused product.

On April 26, 2004, PHG's counsel wrote to TimeMed's counsel to give notice that the U.S. Patent and Trademark Office had issued a "notice of allowance" with regard to PHG's design patent application. (Pl. Ex. 11.) The letter encouraged counsel to make contact to discuss any interest TimeMed might have in obtaining a license to make and/or distribute PHG's medical label sheets. According to Casale, by 2004 TimeMed had established a market for its accused product, TimeMed felt PHG's design patents could not be defended, and thus, TimeMed willfully continued selling its accused product.

On December 30, 2005, PHG's counsel sent another cease-and-desist letter to TimeMed informing it of PHG's patent rights and of this Court's entry of a preliminary injunction against another alleged infringer. (Pl. Ex. 12.) The letter did not include any reference to TimeMed obtaining a license.[3] TimeMed continued to sell its allegedly infringing product.

Casale testified TimeMed, which conducts business with numerous hospitals in the United States, has been selling its competing product for three years and TimeMed has attained

_____

[3]The Court notes that PHG was represented by a different law firm on each occasion when a letter was sent to TimeMed or its counsel. PHG claims that at least some of the delay in bringing this action and seeking injunctive relief can be attributed to necessary changes in representation by counsel.

14

substantial sales of its product which has in turn generated substantial revenue.[4] The average sale price per box of TimeMed's accused product is substantially lower than PHG's price. Casale testified that the imposition of an injunction would cause hardship for TimeMed and damage to its integrity in the marketplace because TimeMed does not harbor any intent to commit an illegal act--that is, infringement of PHG's design patents. Although it appears there is some business relationship between TimeMed and LaserBand, TimeMed does not purchase any of its accused product from LaserBand, but rather manufactures the product in-house.

LaserBand's accused product, the PLS-303X (Pl. Ex. 7), was designed in May 2005 and manufactured shortly thereafter by Avery Dennison for LaserBand and its related company, Riley, Barnard and O'Connell ("RB&O").[5] (Pl. Exs. 44, 45 & 46.) One of RB&O's largest customers, St. Louis University Hospital, utilized PHG's EasyID software and approached RB&O with samples of Holden Graphic's product and PHG's patent-pending product and asked if a

---

[4]Because the relevant portion of Casale's testimony is under seal as "highly confidential" under the Protective Order entered in this case, the Court will not state in its opinion the specifics concerning TimeMed's sales of, and revenues from, its accused product.

[5]James M. Riley is founder, principal owner, and Chairman of LaserBand, a limited liability company located in Missouri. His partner, Sanjay Jain, is LaserBand's President and Chief Executive Officer.
        Riley is also founder, principal owner, and President of RB&O, an established St. Louis, Missouri company which designs and distributes business forms and labels.

similar label sheet could be produced.  LaserBand sent the matter to patent counsel for advice.  LaserBand then devised a different label sheet, the PLS-303X, which, according to Sanjay Jain, is not ornamentally the same as the 20-101.  LaserBand's accused product is similar to PHG's 20-101, except that the PLS-303X has rounded corners on the outer edges of the top 27 labels (three columns of nine rows), as well as rounded corners at the outer edges of the bottom two rows of labels.  The PLS-303X also omits a die cut which would form another small label at the bottom left-hand corner of the sheet, as appears on the 20-101.[6]  LaserBand's accused product is imprinted with "PLS-303X" in blue ink at the bottom right-hand corner and the art date at the upper right-hand corner; these features are, according to Jain, part of LaserBand's distinctive trade dress.  Thomas Stewart testified that, in his opinion, an ordinary consumer of the 20-101 would be confused by the PLS-303X.

Although LaserBand posted the PLS-303X on its Internet website for three months in 2005, no one contacted LaserBand about purchasing the product as a result of the Internet posting, and LaserBand removed the product from its website after receiving notification of potential infringement from PHG's counsel.

---

[6]At the preliminary injunction hearing held in PHG Technologies v. The St. John Companies, Civ. No. 05-0630, on November 22, 2005, Moyer testified that the design depicted in the '405 and '197 patents would be altered, and in fact, destroyed if one "were to erase some of those labels that are depicted in [the] design[.]" (Def. Ex. 4.)

LaserBand's sales of the PLS-303X constitute a very small portion of LaserBand's total sales revenue. LaserBand's total sales revenue for all products it sells is higher than PHG's total sales revenue, but lower than RB&O's, which is lower than TimeMed's.[7]

According to Jain, LaserBand offered employment to Gary Duffett, a former Avery Dennison employee, in January 2006 and he started work with LaserBand in March 2006. LaserBand had long before finished its design of the PLS-303X. While still employed at Avery Dennison, Duffett accepted an order from LaserBand for the manufacture of the PLS-303X, but Duffett was not involved in the design of the PLS-303X while he was employed at Avery Dennison and selling the 20-101 to PHG. Avery Dennison filled three or four orders for the PLS-303X for LaserBand and then, because of production backlog at Avery Dennison, LaserBand moved its business for the PLS-303X to Ward/Kraft.

Jim Riley testified that, based on his lengthy and extensive experience in the industry, Ward/Kraft's quotations to PHG constituted an offer to sell the 20-101, the parties could base their sales price on the quotation, and further negotiation was not needed to consummate an agreement. According to Riley, Ward/Kraft determined the materials and dies needed to manufacture the labels, it calculated necessary equipment time, and it produced a cost

_____

[7]Again, in view of the Protective Order, the Court will not include in its opinion any detail about LaserBand's gross sales revenue.

17

estimate set forth in the quotation to which it would consider itself bound and upon which PHG could rely.

Riley also testified that, even though hole punches were part of the prior art before he designed the PLS-103 in 1996 or 1997, (Pl. Exs. 47-53), none of the hole punches seen in the prior art were in the same configuration as the five- and seven-hole punches used in the PLS-103, which was novel at the time he created it.

PHG initially sued The St. John Companies in a related case before this Court, No. 3:05-0630, believing that St. John was causing the most serious infringement of PHG's design patents. Stewart testified that PHG delayed in filing that complaint and seeking preliminary injunctive relief due to a change in counsel and for the period of time needed to research the cost of litigation. After this Court entered a preliminary injunction in PHG's favor against The St. John Companies on December 5, 2005, PHG learned TimeMed was a more serious infringer, and PHG then filed this case against TimeMed, LaserBand and Holden Graphics on December 30, 2005. When settlement negotiations broke down between April and June 2006, PHG filed the instant motion for a preliminary injunction against TimeMed and LaserBand on May 5, 2006.

According to Stewart and Moyer, PHG is a small company, it depends on a sales force of only two or three people to increase business, and PHG has suffered and will continue to suffer irreparable harm because of TimeMed's and LaserBand's sales of

18

their competing products. Stewart and Moyer testified that PHG has lost sales and profits that would be made from those sales; the marketplace for PHG's patented product has eroded severely, impacting the price PHG can command for its patented product; PHG's business relationships with customers and potential customers have been detrimentally affected; and PHG has lost the opportunity to expand its sales lines. Without going into detail in this opinion about highly confidential business information disclosed at the hearing, Stewart and Moyer testified that PHG's marketing strategy and long-term business planning have been seriously impacted by the sales of TimeMed's and LaserBand's competing products. PHG did not present any direct evidence that TimeMed's and LaserBand's products have confused PHG customers.

## II.  STANDARDS OF REVIEW

Whether to grant a preliminary injunction under 35 U.S.C. §§ 283 is within the Court's discretion. Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1579 (Fed. Cir. 1983). In determining whether PHG has established a right to preliminary injunctive relief, the Court must consider four factors: (1) whether PHG has sufficiently established a reasonable likelihood of success on the merits; (2) whether PHG would suffer irreparable harm if the injunction were not granted; (3) whether the balance of hardships tips in PHG's favor; and (4) the impact, if any, of the injunction on the public interest. See Hybritech Inc. v. Abbott Lab., 849 F.2d 1446, 1451 (Fed. Cir. 1988). The Court must weigh and assess

each factor against the others and against the form and magnitude of the relief requested. Id. Although the Federal Circuit has cautioned that a preliminary injunction is a drastic and extraordinary remedy that should not be routinely granted, Nutrition 21 v. United States, 930 F.2d 867, 869 (Fed. Cir. 1991), the court subsequently explained that injunctive relief is not meant to be rare or practically unattainable. Rather, injunctive relief "must be thoroughly justified[,]" and it cannot be granted as a matter of right. Polymer Technologies, Inc. v. Bridwell, 103 F.3d 970, 977 (Fed. Cir. 1996).

TimeMed and LaserBand may succeed in defeating the motion for a preliminary injunction if each raises a substantial question of patent invalidity. See Amazon.com, Inc. v. BarnesandNoble.com, Inc., 239 F.3d 1343, 1358 (Fed. Cir. 2001). The Defendants need not produce the clear and convincing evidence of patent invalidity that would be required at trial. Id. at 1359. Instead, they must show only that PHG's design patents are vulnerable to a validity challenge. Id.

To prevail on the motion for summary judgment on the ground of patent invalidity, however, TimeMed and LaserBand "must demonstrate a lack of genuine dispute about material facts and show that the facts not in dispute are clear and convincing in demonstrating invalidity." Id. On summary judgment, the Court must take the facts in the light most favorable to PHG and determine whether TimeMed and LaserBand are entitled to judgment on patent invalidity as a matter of law. See Anderson v. Liberty Lobby, 477 U.S. 242,

20

248 (1986); <u>Continental Plastic Containers v. Owens Brockway Plastic Prods., Inc.</u>, 141 F.3d 1073, 1076-1077 (Fed. Cir. 1998).

<u>**III.  ANALYSIS**</u>

**A.  The motion for summary judgment**

Title 35 U.S.C. § 102(b) provides: "A person shall be entitled to a patent unless . . . the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States[.]"  Whether a particular activity raises the on-sale bar is a question of law based on the underlying factual considerations.  <u>Dana Corp. v. American Axle & Mfg., Inc.</u>, 279 F.3d 1372, 1375 (Fed. Cir. 2002).

Under <u>Pfaff v. Wells Elec., Inc.</u>, 525 U.S. 55, 67 (1998), the on-sale bar applies when two conditions are satisfied before the critical date: (1) the product is "the subject of a commercial offer for sale" and (2) the invention is ready for patenting either by having the invention reduced to practice or by preparing drawings or other descriptions of the invention that would enable one skilled in the art to practice the invention.  The purpose of the on-sale bar is to encourage inventors to seek a patent promptly so as not to prolong the statutory right of exclusivity given to a patentee, <u>Woodland Trust v. Flowertree Nursery, Inc.</u>, 148 F.3d 1368, 1370 (Fed. Cir. 1998), and a single sale or offer to sell is enough to trigger the on-sale bar.  <u>Intel Corp. v. United States Int'l Trade Comm'n</u>, 946 F.2d 821, 830 (Fed. Cir. 1991).

Sales by suppliers and other third parties to the patentee qualify as sales under the first prong of the <u>Pfaff</u> test when the

21

transaction is between separate entities. Special Devices, Inc. v. OEA, Inc., 270 F.3d 1353, 1355 (Fed. Cir. 2001) (holding "neither the statutory text, nor precedent nor the primary purpose of the on-sale bar allows" grant of patentee's request to adopt an exception to the on-sale bar for patentee-supplier sales). In other words, section 102(b) does not require the patentee to make a sale to a consumer to satisfy the first prong of the Pfaff test. "[I]t only matters that someone--inventor, supplier or third party--placed it on sale." Id.

Because a patent is presumptively valid, see 35 U.S.C. § 282, an accused infringer must demonstrate by clear and convincing evidence that there was a definite sale or offer to sell more than one year before application for the patent and that the subject matter of the sale or offer to sell fully anticipated the claimed invention. Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045-1046 (Fed. Cir. 2001).

1.  "*The subject of a commercial offer for sale*"

"Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." Group One, Ltd., 254 F.3d at 1048. See also Linear Technology Corp. v. Micrel, Inc., 275 F.3d 1040, 1050 (Fed. Cir. 2002) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."). In any situation, determining who is the

22

offeror and what constitutes a definite offer, requires examination of the language of the proposal itself. Id. "Language suggesting a legal offer, such as 'I offer' or 'I promise' can be contrasted with language suggesting more preliminary negotiations, such as 'I quote' or 'are you interested.'" Id. Put another way, a commercial "sale" occurs when the parties offer or agree to reach a contract to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold. Special Devices, Inc., 270 F.3d at 1355.

Defendants first contend that the patented design was "on sale" as of June 30, 2000, when Ward/Kraft offered to manufacture for PHG an initial quantity of 4,000 label sheets which embodied the 20-101 design. This is the same design which later became the subject of the '405 and '197 patents.

In response, PHG points out that Moyer did not receive a written quotation from Ward/Kraft on that date and notes that Moyer testified about the June 30 price quote as follows:

> [W]e started talking about some test product run, and that was a whole different pricing structure because we were talking very small quantities. And that was a requirement of ours to be able to get some test product in and make sure they were able to produce this and that it met our specifications.

(Moyer Depo. II at 26:10-19.) TimeMed has not identified any other evidence to establish that the quotation was a commercial offer for sale.

The Court concludes that, as of June 30, 2000, Ward/Kraft and PHG were in preliminary negotiations about the prospect of

23

manufacturing one or more test runs of the 20-101 to allow PHG to determine if Ward/Kraft could produce the product to PHG's specifications. Earlier, on June 13, 2000, Moyer sent a letter to Ward/Kraft enclosing "a sample of the label stock we are interested in you manufacturing for us." (Pl. Ex. 14.) Moyer also stated: "I am interested in pricing and lead-time for samples and production runs." This letter was a request for information.

On June 21, 2000, Ward/Kraft responded with a written quotation, No. LR 22966, proposing to manufacture quantities of 100,000 and higher. (Pl. Ex. 18.) However, Moyer did not act on that quotation because, in the meantime, PHG arrived at a different label design--the one eventually patented. On June 30, 2000, Moyer provided the new design to Ward/Kraft and asked whether "there is any change to your previous quote." (Pl. Ex. 20.) Thereafter, Moyer talked with Ward/Kraft representatives by telephone and received an oral quotation for the manufacture of four boxes (4,000 label sheets) at a specific price per box. The same day, Moyer authorized Ward/Kraft to obtain the die cut for the 20-101 design. But there is no other evidence before the Court confirming that PHG and Ward/Kraft reached a contract for the manufacture of 4,000 label sheets at a set price per box on June 30, 2000. See Special Devices, Inc., 270 F.3d at 1355; Linear Technology Corp., 275 F.3d at 1040 (communications cannot be considered offers because they do not indicate party's intent to be bound, as required for valid offer).

24

Defendants next contend the patented design was on sale by July 10, 2000, when Ward/Kraft accepted PHG's order for the manufacture of 4,000 label sheets embodying the 20-101 design at the set price the parties discussed previously. (Pl. Ex. 21.) PHG does not directly address TimeMed's argument that a contract for sale was formed on July 10, 2000. (Docket Entry No. 134-2, Memorandum at 10 n.2.) PHG responds that "the analysis of this fact" should be addressed under the Brasseler "small inventor" exception.

In Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 182 F.3d 888, 891-892 (Fed. Cir. 1999), the Federal Circuit affirmed a judgment of patent invalidity where the inventors commercially exploited the invention before the critical date through the sale of over 3,000 surgical saw blades embodying the invention set forth in the claims of a utility patent. In so holding, the court stated:

> This is not a case in which an individual inventor takes a design to a fabricator and pays the fabricator for its services in fabricating a few sample products. Here DS Manufacturing made a large number of the agreed-upon product for general marketing by Brasseler. The transaction was invoiced as a sale of product, and the parties understood the transaction to be such.

Id. at 891.

PHG contends that it falls within this Brasseler exception: it took the design to a fabricator, Ward/Kraft, and paid Ward/Kraft for its services in fabricating a reasonable number of sample label sheets. As shown by the PHG-Ward/Kraft documents, although larger production runs were discussed and contemplated in the summer of

25

2000, both PHG and Ward/Kraft understood that the first samples were fabricated as "test runs." (Pl. Ex. 21 at 2 ("THIS IS A TEST RUN"); Pl. Ex. 22 ("Please get back to me with your thoughts and a time frame for another test run."; Pl. Ex. 28 ("Please keep me posted with the status of the next test run."; Pl. Ex. 26 at 2 ("THIS IS A 2ND TEST RUN".)  The evidence shows that PHG ran the sample label sheets Ward/Kraft manufactured through various laser printers to see how the product would perform before PHG contracted with Ward/Kraft in October 2000 to mass-produce the label sheets for commercial sale to customers.

A question the Court must address is whether the __Brasseler__ exception applies where a design patent is at issue.  In __Pfaff__, 525 U.S. at 67, which involved a utility patent, the inventor accepted a purchase order for the product more than one year before the critical date, and there was "no question that the sale was commercial rather than experimental in character."  Thus, where the invention was also ready for patenting at that time, the issued patent was held invalid.  __Id.__ at 68-69.  In explaining its reasoning, the Supreme Court stated:

> [A]n inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention--even if such testing occurs in the public eye.  The law has long recognized the distinction between inventions put to experimental use and products sold commercially.

__Pfaff__, 525 U.S. at 64.  The Court observed that an inventor is deprived of his right to a patent if he attempts to use his invention for profit for any longer period than one year before his

26

patent application. Id. (relying on City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 137 (1877)). When, however, delay in obtaining a patent is caused "'by a *bona fide* effort to bring [the] invention to perfection, or to ascertain whether it will answer the purpose intended[,]" a patent may issue. Id. at 64-65 (quoting Elizabeth).

Here, Defendants contend that the principles discussed in Pfaff, referred to as experimental use negation, are inapplicable where a design patent is concerned. Defendants rely on Continental Plastic Containers v. Owens Brockway Plastic Prods., Inc., 141 F.3d 1073, 1079 (Fed. Cir. 1998) (emphasis added), in which the Federal Circuit stated that "[e]xperimental use negation applies, in utility patent cases, if there is genuine experimentation directed to perfecting the features of the claimed invention." Experimental use cannot occur after a reduction of the invention to practice, and

> [s]ince design inventions are reduced to practice as soon as an embodiment is constructed, experimental use negation is virtually inapplicable in the design patent context. Applying experimental use negation in the design patent context would allow entities to increase the life of their design patents merely by tarrying over the production of the article of manufacture.

Id. (emphasis added). Continental nonetheless contended that, regardless of whether the design was reduced to practice, Continental was merely perfecting the functional aspects of its design and under Tone Bros., Inc. v. Sysco Corp., 28 F.3d 1192, 1199 (Fed. Cir. 1994), the sale should be subject to experimental use negation.

27

Like Continental, PHG also relies on <u>Tone Bros.</u>[8]  In that case, the Federal Circuit held that "experimentation directed to functional features of a product also containing an ornamental design may negate what otherwise would be considered a public use within the meaning of section 102(b)."  In that case, the patentee Tone, which processes and packages bulk herbs and spices, conceived of a new clear, plastic spice container rather than the traditional tin spice package or opaque plastic container.  <u>Id.</u> at 1196.  Tone obtained a design patent on the ornamental design for a jar or similar article as shown.  <u>Id.</u> at 1194.  At about the same time the patent application was filed, Tone began selling herbs and spices in the container.  <u>Id.</u>  The alleged infringer, Sysco, began using a similar container when its private label arrangement with Tone ended.  <u>Id.</u>

The district court adopted Sysco's argument that the patented design was in public use within the meaning of § 102(b) more than a year before the patent application because Tone showed the design, embodied in a prototype container, to a group of ten college students.  The prototype and two other spice containers were shown to the students to evaluate the "feel, hold and handling" of the container.  <u>Id.</u> at 1197.  In other words, "the new container was given to the students to see if it worked properly.

_____

[8]In the reply in support of the motion for preliminary injunction, PHG drops footnote 15 at page 34 of the brief suggesting the Court need not reach the issue of experimental use negation in connection with the preliminary injunction motion, with the caveat that PHG does not waive any arguments based on <u>Tone Bros.</u> and <u>Continental Plastic Containers</u>.

. . . They were asked to test the functional features of the container." Id. The Federal Circuit reversed the finding of patent invalidity based on public use on the ground that the testing was not for commercial exploitation, but for the *bona fide* purpose of testing the functional features of the design. Id. at 1199.

PHG suggests the same analysis should apply in this case because PHG purchased sample label sheets from Ward/Kraft for the *bona fide* purpose of testing the functional features of the design.

In Continental Plastic Containers, 141 F.3d at 1079-1080, the Federal Circuit stated that, even if it extended Tone Bros., a "public use" case, to the "on-sale" context, there was no nexus in that case between the alleged experimentation and the sale. Continental did not sell bottles for any purpose other than commercial exploitation. Id. at 1080. The court stated:

> This is not a case in which Continental sold a discrete number of the bottles to L & A Juice so that L & A Juice might experiment on them to ascertain whether they were suitable for a particular purpose. In fact, under the terms of its supply agreement with L & A Juice, Continental was to provide as many bottles of the patented design as L & A Juice required for its retail sales. This is a clear commercial exploitation unaccompanied by any of the indicia of experimentation.

Id.

Here, by contrast, taking the facts in a light most favorable to PHG, PHG purchased a discrete number of label sheets from Ward/Kraft in July 2000, which were received in late August 2000 and were used for the sole purpose of experimentation to ascertain whether the functional aspects of the patented designs were

29

suitable for a particular purpose. See EZ Dock, Inc. v. Schafer
Sys., Inc., 276 F.3d 1347, 1352 (Fed. Cir. 2002) (noting that
experimentation evidence includes tests needed to convince the
inventor that the invention is capable of performing its intended
purpose in its intended environment). Moyer's memorandum to
Ward/Kraft dated August 24, 2000 listed the problems with the label
sheets and why they were not suitable for production printing in
hospitals' laser printers. PHG destroyed the remainder of the
sample label sheets and did not sell them commercially to
customers. Thus, TimeMed has not shown that it is entitled to
summary judgment on the July 10, 2000 order for label sheets.

Next, TimeMed argues that the design was "on sale" because
Ward/Kraft sent a written quotation to PHG on August 25, 2000
offering to sell PHG thousands of 20-101 labels for commercial re-
sale to PHG's customers (Pl. Ex. 24), and PHG expressed its intent
to accept that offer on August 28, 2000. (Pl. Ex. 25.) As PHG
correctly points out, it is clear from Ward/Kraft's quotation that
more than "simply acceptance" was required to conclude any
agreement. See Group One, Ltd., 254 F.3d at 1048. The document
itself was a "Quotation," and such language suggests preliminary
negotiation, rather than legal offer. Id. Additionally, no
specific method of payment was discussed. The quotation itself
stated that it was "subject to credit approval at time of order."
The method and specific time of delivery were not explicitly stated
in the quotation. While the quote included two quantity and price
figures, PHG did not order either quantity; rather, PHG ordered a

30

second test run of 4,000 labels on September 5, 2000. (Pl. Ex. 26.) The quotation stated that the "price is based on producing, shipping & billing in one release," but these details were not yet negotiated. The quotation expressly stated that any changes in specifications would affect pricing and the quote was good for only sixty days. Where the communication between the parties lacks definite terms, including quantity, time of delivery, or place of delivery, there is no offer for sale. <u>Gemmy Indus. Corp. v. Chrisha Creations Limited</u>, — F.3d —, 2006 WL 1703492 at * 6 (Fed. Cir. June 22, 2006); <u>Elan Corp., PLC v. Andrx Pharm., Inc.</u>, 366 F.3d 1336, 1340-1341 (Fed. Cir. 2004).

Moreover, Moyer's August 28, 2000 letter to Ward/Kraft cannot be read as an acceptance of an offer. Moyer set forth PHG's intent at some time in the future to purchase at least 1,000 cases of labels at the price stated in the August 25 quotation, but he also made abundantly clear that "[t]his purchase is contingent upon a successful manufacturing run resulting in labels that address the deficiencies outlined in my memo dated" August 24, 2000. (Pl. Ex. 25.) He asked to be kept posted on the "next test run" and closed with the following: "I believe this can be a profitable venture for both companies, but it is imperative that we get a sellable product as soon as possible." Because Ward/Kraft had not met the contingency to produce a sellable product, it cannot be said that Moyer's letter objectively manifested assent to an offer from Ward/Kraft to manufacture a production run of labels for commercial exploitation. <u>See Linear Technology Corp.</u>, 275 F.3d at 1052-1053.

31

Finally, Defendants contend that PHG's order for 4,000 more labels for the second test run on September 5, 2000 raises the "on-sale" bar. For the same reasons stated above with regard to the first test run, the Court holds that it did not. As in <u>Brasseler</u>, 182 F.3d at 891, PHG took its design to a fabricator and paid the fabricator for its services in fabricating sample products. TimeMed has not produced any evidence that PHG ordered the labels for commercial exploitation.

Because TimeMed has not shown its entitlement to summary judgment by clear and convincing evidence that the patented design was the subject of a commercial offer for sale more than one year before the critical date, the Court need not address the second prong of the <u>Pfaff</u> test: whether the invention was ready for patenting at the time it was offered for sale. On the evidence presented, the Court concludes that TimeMed and LaserBand are not entitled to summary judgment as a matter of law, and therefore, their motions for summary judgment will be DENIED.

**B. The motion for a preliminary injunction**

    *1. PHG's likelihood of success on the merits*

        **a. Validity of the patents**

LaserBand and TimeMed first contend that PHG cannot show a reasonable likelihood of success on the merits because the '405 and '197 design patents are invalid due to the on-sale bar, as argued in their motion for summary judgment. Defendants need not produce the clear and convincing evidence of patent invalidity that would be required at trial. <u>Amazon.com, Inc.</u>, 239 F.3d at 1359.

Instead, Defendants must show only that PHG's design patents are vulnerable to a validity challenge. <u>Id.</u>

The Court incorporates by reference its previous analysis in this opinion concerning Defendants' motion for summary judgment. For the same reasons stated above, the Court concludes that LaserBand and TimeMed have not shown PHG's design patents are vulnerable to a validity challenge on the ground of an on-sale bar. Thus, the on-sale bar defense does not prevent PHG from obtaining injunctive relief.

Defendants next contend that PHG cannot show a reasonable likelihood of success on the merits because its design patents have not been infringed. Whether a design patent is infringed is determined by first construing the claim to the design and then comparing it to the accused design. <u>Elmer v. ICC Fabricating, Inc.</u>, 67 F.3d 1571, 1577 (Fed. Cir. 1995); <u>Oddzon Prod., Inc. v. Just Toys, Inc.</u>, 122 F.3d 1396, 1404 (Fed. Cir. 1997). The Court must determine whether the patented design as a whole is substantially similar in appearance to the accused design. <u>Oddzon Prod., Inc.</u>, 122 F.3d at 1405. The patented and accused designs are compared for overall visual similarity. <u>Elmer</u>, 67 F.3d at 1577; <u>Contessa Food Prods., Inc. v. Conagra, Inc.</u>, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

Comparison of the patented design to the accused design involves two distinct tests, both of which must be satisfied in order to find infringement: (1) the "ordinary observer" test and

33

(2) the "point of novelty" test. <u>Contessa Food Prods., Inc.</u>, 282 F.3d at 1376; <u>Payless Shoesource, Inc. v. Reebok Int'l Ltd.</u>, 998 F.2d 985, 990 (Fed. Cir. 1993); <u>Unidynamics Corp. v. Automatic Prods. Int'l Ltd.</u>, 157 F.3d 1311, 1323 (Fed. Cir. 1998).

The "ordinary observer" test originated in <u>Gorham Co. v. White</u>, 81 U.S. (14 Wall.) 511, 528 (1871):

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

Under <u>Gorham</u> the focus is on the overall ornamental appearance of the claimed design, not selected ornamental features. <u>Elmer</u>, 67 F.3d at 1578. Proper application of the <u>Gorham</u> test requires that an accused design be compared to the claimed design, not to a commercial embodiment. <u>Payless Shoesource, Inc.</u>, 998 F.2d at 990.

The "point of novelty" test requires proof that the accused design appropriates the novelty which distinguishes the patented design from the prior art. <u>Contessa Food Prods., Inc.</u>, 282 F.3d at 1377. Although application of the two tests may sometimes lead to the same result, it is legal error to merge the two tests, for example, by relying on the claimed overall design as the point of novelty. <u>Contessa Food Prods., Inc.</u>, 282 F.3d at 1377. The focus of the "point of novelty" test is on those aspects of the patented design that make it different from prior art. <u>Id.</u> The ultimate question is whether the effect of the accused design viewed as a

34

whole is substantially the same as the patented design. <u>Payless</u> <u>Shoesource, Inc.</u>, 998 F.2d at 991.

PHG's claim in the '405 patent is the "ornamental design for the medical label sheet, as shown." ( Pl. Ex. 3.) Figures 1 and 2 show the front view and front perspective view of the Medical Label Sheet. Figures 3, 5 and 6 show three alternative embodiments of the Medical Label Sheet. PHG's claim in the '197 patent is the "ornamental design for a label pattern for a medical label sheet, as shown." (Pl. Ex. 5.) Figures 1 and 2 show the front view and front perspective view of the label pattern for a medical label sheet. As to both patents, PHG identifies the ornamental features of its design as the size and the placement of labels on the medical label sheet.

The Court must compare the overall design of LaserBand's and TimeMed's medical label sheets to the ornamental depiction claimed in PHG's design patents. When compared, TimeMed's accused design (Pl. Ex. 6) is nearly identical to PHG's patented design. The only differences in TimeMed's design are that the outer four label corners are round, not square, and in the embodiment of the design, there is a die cut around the perimeter of the label sheet that is not present in PHG's 20-101. An ordinary observer would be required to look very closely at TimeMed's design to spot the four rounded corners. Other than the four rounded corners, an ordinary observer would be unable to identify any other differences in

35

TimeMed's design and PHG's patented design. The Court is to compare the accused design to the claimed design; the Court is not to compare the claimed design to TimeMed's commercial embodiment, which includes the perimeter die cut. The same configuration of hole punches as shown in the '405 patent at the top and left side of the patented label sheet is found in TimeMed's design as well. TimeMed's design also appropriates the novelty of PHG's patented design which distinguishes it from the prior art, that is, the different sizes of labels in the bottom two rows and their placement on the sheet. See Contessa Food Prods., Inc., 282 F.3d at 1377. Thus, PHG likely will be able to show that TimeMed's design infringes on PHG's patented design.

The Court next compares LaserBand's overall design to the ornamental depiction claimed in PHG's design patents. LaserBand's accused design (Pl. Ex. 7) is very similar to PHG's patented design, except that LaserBand's has rounded upper right and left corners, as well as rounded corners at the outer edges of the bottom two rows of labels. LaserBand's design omits a small cavity at the bottom left-hand corner of the design, which is claimed in PHG's patented design.

LaserBand contends Moyer admitted under oath that the removal of a label cavity claimed in the '405 and '197 patents would alter and, in fact, destroy the patented design. (Civ. No. 05-0630, Nov. 22, 2005 Prelim. Inj. Hr'g Tr. at 76.) The Court finds, however,

36

that Moyer was asked if his design would be altered or destroyed "if you were to erase some of those labels that are depicted in your design, would that change your design?"  To this question, Moyer answered "Yes, it would."  (Id.)

LaserBand's design "erases" only one small label at the lower left corner of the design, and this distinction could be readily missed by an ordinary observer.  Slight variations between the claimed design and the accused design do not prevent a finding of infringement where the overall effect of the design is substantially the same.  Payless Shoesource Inc., 998 F.2d at 991; Litton Sys., Inc. v. Whirlpool Corp., 728 F.2d 1423, 1444 (Fed. Cir. 1984) ("Minor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement."); American Standard, Inc. v. Lyons Indus., Inc., 1998 U.S. Dist. LEXIS 22882 at *27 (D. N.J. 1998) ("That Lyons' sinks do not also contain several other purported points of novelty is irrelevant.").  Making an overall comparison of the designs, the Court concludes that LaserBand's and PHG's designs are substantially the same and the resemblance is such as to deceive an ordinary observer who gives such attention as a purchaser usually gives.  See Gorham Co., 81 U.S. at 528.

LaserBand relies on this Court's previous notation in a prior opinion that Avery Dennison, one of the largest label sheet manufacturers in North America, agreed to manufacture the PLS-303X

37

for LaserBand because it was materially different from PHG's 20-101. In its prior opinion, the Court did not make a finding that the PLS-303X was materially different from PHG's 20-101. The Court merely stated the fact that Avery Dennison agreed to manufacture the PLS-303X because *it believed* the PLS-303X was materially different from PHG's 20-101. As a large manufacturer of label sheets, Avery Dennison would be expected to discern small differences between label sheets submitted to it for manufacture. An ordinary observer, however, giving such attention as a purchaser usually gives, could understandably confuse LaserBand's design for PHG's patented design. In addition, Avery Dennison may have recognized a self-interest in not admitting that it knowingly manufactured a patented label product for a competitor of the patent owner without obtaining consent to do so.

LaserBand's design appropriates the novelty of PHG's patented design which distinguishes it from the prior art, that is, all but one of the different sizes of labels in the bottom two rows and their placement in the design. See <u>Contessa Food Prods., Inc.</u>, 282 F.3d at 1377. Omission of the small label from the lower left corner is of minimal importance where LaserBand appropriated the same sizes of adult and pediatric wristband labels and their placements within the overall design. See <u>Payless Shoesource Inc.</u>, 998 F.2d at 991. The fact that LaserBand's accused product is imprinted with "PLS-303X" in blue ink at the bottom right-hand

38

corner and the art date at the upper right-hand corner is not relevant to the Court's analysis in comparing the overall designs of the label sheets. Thus, PHG likely will be able to show that LaserBand's design infringes on PHG's patented design.

LaserBand and TimeMed next contend that the patents-in-suit are invalid because the design is functional; that is, the design functions only with PHG's EasyID® software having a particular print template. Defendants rely on <u>Best Lock Corp. v. Ilco Unican Corp.</u>, 94 F.3d 1563, 1565-1566 (Fed. Cir. 1996), where the court held a design patent was invalid because Best Lock's key blade was not a matter of ornamental concern to the purchaser or user and because the shape of the blank key blade was dictated by its function.

Citing other cases, the court noted in <u>Best Lock,</u> however, that a "design is not dictated solely by its function when alternative designs for the article of manufacture are available." <u>Id.</u> at 1566. This Court previously held in granting a preliminary injunction in favor of PHG against The St. John Companies that PHG's design is not solely dictated by its function because there were alternative designs available for the article of manufacture. Moyer and Stewart testified that they arrived at this particular design because it had the "best flow and look." It seems reasonable to believe that PHG could change its software to print to a different design of medical label sheets if it wanted to do

39

so. Also, the evidence shows that at least some of PHG's customers use the 20-101 label sheet without simultaneous use of PHG's protected software. Thus, the Court concludes that <u>Best Lock</u> does not control this case.

Finally, with regard to PHG's likelihood of success on the merits, Defendants contend the patents are unenforceable due to PHG's inequitable conduct in failing to submit to the U.S. Patent and Trademark Office ("PTO") the closest prior art to the patented designs, the PLS-103. <u>See</u> 37 C.F.R. § 1.56; <u>Molins PLC v. Textron, Inc.</u>, 48 F.3d 1172, 1178 (Fed. Cir. 1995) ("Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.") A party alleging inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO. <u>FMC Corp. v. Manitowoc Co.</u>, 835 F.2d 1411, 1415 (Fed. Cir. 1987). "[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct." <u>Allen Organ Co. v. Kimball Int'l, Inc.</u>, 839 F.2d 1556, 1567 (Fed. Cir. 1988).

Even if the Court assumes that the PLS-103 was material to PHG's design patent applications, at this point in the litigation Defendants have not come forward with clear and convincing proof

40

that PHG, acting through its principals, Moyer and Stewart, intended to deceive the PTO. Moyer testified at the recent hearing before the Court that he, Stewart, and patent counsel reviewed all label forms, including the PLS-102, the PLS-103, and the 2610, before filing PHG's patent applications, that he and Stewart relied on the advice of patent counsel, and that he did not recall what the three discussed concerning documents that should be submitted to the PTO. Defendants have not presented any contradictory evidence to show clearly and convincingly that PHG intended to deceive the PTO.[9]

Accordingly, the Court concludes that the various defenses raised are not supported at this time and that PHG has shown a likelihood of success on the merits regarding infringement.

   *2.  PHG's showing of irreparable harm*

Having established the first factor of likelihood of success on the merits through a "clear showing" of both patent validity and infringement, PHG is entitled to a rebuttable presumption of irreparable harm. See <u>Oakley, Inc. v. Sunglass Hut Int'l</u>, 316 F.3d

---

[9]PHG contends the PLS-103 would have been cumulative to information already of record at the PTO, and PHG moves the Court to take judicial notice of the prior art references considered by the patent examiner. (Docket Entry No. 135.) The motion will be DENIED. The Court need not dwell on the materiality issue in light of its ruling that the present record lacks clear and convincing proof of PHG's intent to deceive the PTO. Further, PHG introduced some of the prior art references into evidence at the recent hearing and in the course of the lengthy hearing had ample opportunity to introduce into evidence any other prior art references it wished the Court to review.

41

1331, 1345 (Fed. Cir. 2003); <u>Amazon.com, Inc.</u>, 239 F.3d at 1350; <u>Polymer Technologies, Inc.</u>, 103 F.3d at 973. This presumption acts as a procedural device "'which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer.'" <u>Id.</u> (quoting <u>Reebok Int'l Ltd. v. J. Baker, Inc.</u>, 32 F.3d 1552, 1556 (Fed. Cir. 1994)).

The design patents grant PHG the right to exclude others from using the design without permission. <u>See Polymer Technologies, Inc.</u>, 103 F.3d at 975. This is a valuable property right, and "[i]nventors with small markets are entitled to exclusivity under the patent statute as are those with large markets." <u>Id.</u> PHG has expended the time, effort and money required to obtain patents on its design, and those patents are entitled to protection and enforcement. Experience teaches that "[c]ompetitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's . . . exclusive position by an award of damages and a permanent injunction[,]" because customers may have established relationships with infringers. <u>Id.</u>

Defendants have not rebutted the presumption of irreparable harm. To the contrary, PHG presented evidence which confirms that it has already suffered, and will continue to suffer, substantial damage in lost sales, lost customers, lost future business opportunities, and lost customer goodwill if TimeMed and LaserBand are not enjoined from continuing to market their accused label sheets. Although Defendants suggest PHG can be made whole solely through a monetary award, damages alone cannot rectify the past and

42

impending destruction of PHG's relationships with its customers who may purchase Defendants' accused infringing medical label sheets because of their close appearance to PHG's patented design.

There is some appeal to TimeMed's claim that irreparable harm does not exist because PHG waited too long to seek injunctive relief. Although the '405 patent issued in September 2004, and the broader '197 patent issued in March 2005, PHG waited until December 2005 to file suit and until May 2006 to seek injunctive relief, a period of approximately 20 months. TimeMed argues PHG knew about TimeMed's accused product as early as August 2003 when PHG first sent TimeMed a cease and desist letter, but the patents had not issued at that time, and PHG did not have grounds upon which to sue.

PHG claims the delay was justified. Near the time PHG's patents issued, PHG's patent counsel left his law firm and PHG was temporarily without counsel. PGH then had to find appropriate counsel to undertake the litigation, it had to conduct due diligence and investigate the claims, and it had to determine whether it could afford the litigation financially. At the time PHG sued The St. John Companies for infringement in August 2005, PHG believed St. John represented the bulk of the sales of infringing label sheets. Promptly upon learning that Defendants actually represent a significant portion of the market for infringing label sheets, on December 30, 2005, PHG filed suit against these Defendants. PHG withheld service to explore the possibility of settlement, and finally filed the instant motion for

43

a preliminary injunction when settlement efforts collapsed in May 2006.

While the Court believes PHG may have been able to move more quickly to protect its rights, the passage of time alone does not rebut the presumption of irreparable harm that arises in PHG's favor, nor does it rebut the evidence of irreparable harm PHG has and will continue to suffer if a preliminary injunction is not issued. Following entry of the preliminary injunction against St. John, PHG filed suit against TimeMed promptly upon learning that TimeMed had picked up a large share of St. John's infringing business. Moreover, PHG's decision to sue St. John first does not mitigate against a finding of irreparable harm. Polymer Technologies, Inc., 103 F.3d at 975 ("A patentee does not have to sue all infringers at once. Picking off one infringer at a time is not inconsistent with being irreparably harmed.") Finally, the Court concludes PHG acted reasonably in attempting to settle the case first before proceeding with a motion for injunctive relief. When those efforts failed, PHG immediately filed the instant motion. The Court concludes PHG has shown irreparable harm.

3.  *The balance of hardships*

Defendants concede they are larger companies than PHG and that their sales of infringing products represent a relatively small portion of their overall sales. On the other hand, PHG depends heavily on sales of its 20-101 label sheet, which incorporates the patented designs, and is sold in tandem with PHG's software. As a smaller business entity, PHG has fewer resources at its disposal to

44

devote to enforcement of its design patents and to counteract Defendants' infringing conduct in the marketplace. The evidence shows that the price for goods PHG previously obtained has eroded as a result of the marketing of Defendants' accused products. Continued infringement poses a greater threat to PHG than the entry of a preliminary injunction poses to the Defendants. Thus, the Court concludes the balance of hardships tips in favor of PHG.

    4. *The impact of an injunction on the public interest*

Defendants contend that public policy precludes enforcement of invalid and unenforceable patents. But as the Court has previously explained, there does not exist clear and convincing evidence at this point that PHG's patents are invalid and unenforceable.

The Court recognizes the public interest in permitting free competition and allowing hospitals to lower their costs. However, Defendants' private interest in selling a lower-priced product does not justify infringing a patent. <u>Payless Shoesource, Inc.</u>, 998 F.2d at 991. "Were that to be a justification for patent infringement, most injunctions would be denied because copiers universally price their products lower than innovators." <u>Id.</u> Thus, the Court concludes the public interest factor weighs in favor of PHG as well.

Because PHG has made a sufficient showing on each of the four factors, injunctive relief is warranted. <u>See Amazon.com, Inc.</u>, 239 F.3d at 1350.

**IV. CONCLUSION**

45

In summary, a preliminary injunction against TimeMed and LaserBand is warranted because these Defendants failed to carry their burden to establish a substantial question concerning the invalidity or unenforceability of PHG's design patents, '405 and '197, PHG established a reasonable likelihood that it will prevail on the issues of patent validity and infringement, PHG established irreparable harm, and the balance of hardships and the public interest weigh in PHG's favor. Therefore, PHG's Motion for Preliminary Injunction will be GRANTED. The Court will require PHG to post a surety bond in the amount of $400,000.00 in favor of TimeMed and LaserBand, in compliance with Federal Rule of Civil Procedure 65(c).

Defendants did not carry their burden on summary judgment to show by clear and convincing evidence that PHG's patents are invalid due to an on-sale bar, and therefore, they are not entitled to summary judgment on that ground. The motion for summary judgment will be DENIED.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE